IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **DOMINICK DIMEOLA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:05cv0988** |
| **MICHAEL J. ASTRUE,** [1] | ) | |
| **Commissioner of Social Security,** | ) | **Judge Thomas A. Wiseman, Jr.** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI") benefits, as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. (Doc. No. 23.) Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. (Doc. No. 33.) Plaintiff has filed a Reply, arguing that Defendant's Response "completely failed to respond to, and thus concedes the validity of, Plaintiff's assertion." (Doc. No. 34, at 1.)

For the reasons stated below, Plaintiff's Motion for Judgment on the Administrative Record will be granted, the decision of the Commissioner reversed, and the cause remanded for further administrative proceedings consistent with this opinion.

I. **INTRODUCTION**

Plaintiff filed his application for Supplemental Security Income ("SSI") benefits on January 17, 2002, alleging that he had been disabled since December 28, 2001 due to muscle aches and pains, brain lesions, bipolar disorder, depression, uncontrolled "severe" Grand Mal seizures, and substance abuse.[2]

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

[2] Plaintiff also applied for child's Disability Insurance Benefits ("DIB"), alleging disability since December 28, 2001. (AR 116–19.) As noted by the ALJ, claimant was twenty-three years of age on that date, making him ineligible for childhood DIB "because his current application constitutes an admission that disability did not begin by age 22." (AR 18.) *Cf.* 20 C.F.R. § 404.350(a)(5).

(*See, e.g.*, Doc. No. 13, Attachment ("(AR)"), at 12, 127, 854.)  Plaintiff's application was denied both

initially (AR 857–59) and upon reconsideration (AR 864–66).  Plaintiff subsequently requested (AR 92–

94) and received (AR 107–09) a hearing.  Plaintiff's hearing was conducted on September 14, 2004 by

Administrative Law Judge ("ALJ") Donald E. Garrison.  (AR 34.)  Plaintiff, Plaintiff's mother Elizabeth

DiMeola, and Vocational Expert Dr. Gordon Doss appeared and testified.  (AR 34–35.)

On October 12, 2004, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was

not disabled within the meaning of the Social Security Act and Regulations.  (AR 14–23.)  Specifically, the

ALJ made the following findings of fact:

1.      The claimant was born on March 26, 1978, and was above age 22 on December 28, 2001, the disability onset date alleged in his Title II application for childhood disability benefits.

2.      No substantial gainful activity has been performed since the alleged onset date.

3.      The claimant has "severe" impairments including: a seizure disorder (with a long history of medical noncompliance); a bipolar disorder; a cognitive disorder; and an ongoing substance abuse disorder (DA/A).

4.      Aside from DA/A and with medicinal compliance, the impairments do not meet or equal the disability requirements of any impairment listed in Appendix One to Subpart P, 20 CFR Part 404, whether considered alone or in combination.

5.      The subjective allegations of disability are not credible when they are examined under the guidelines set forth at 20 CFR 404.1529 and 416.929.

6.      The claimant is a younger individual with a high school equivalency education.

7.      Aside from DA/A and with medicinal compliance, the claimant retains the residual functional capacity for light work not requiring extended maintenance of attention/concentration, understanding, remembering or carrying out more than short simple instructions, making judgments on more than simple work-related decisions or any contact with the general public.

8.      The claimant has no past relevant work.

9.      If the claimant could perform the full range of light work, a directed conclusion of "not disabled" would result under Rule 202.20 of Appendix Two to Subpart P, 20 CFR Part 404.

10.     Although the nonexertional limitations preclude performance of the full range of light work, using Rule 202.20 as a framework for decision making, a significant number of jobs exist in the national economy that he could perform. Examples of such jobs include: general office clerk; domestic housekeeper; and file clerk.

11.     DA/A is a material factor contributing to any inability to work that the claimant experiences.

12.     The claimant has not been under a disability, as defined under the Social Security Act, at any time since December 28, 2001, the alleged disability onset date.

(AR 22-23.

On November 27, 2004, Plaintiff filed a timely request for review of the hearing decision.[3]   (AR 12.)  On September 9, 2005, the Appeals Council issued a letter declining to review the case (AR 8-10), thereby rendering the decision of the ALJ the final decision of the Commissioner.  This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).  If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive.  *Id.*

## II.      REVIEW OF THE RECORD

### A.      Medical Evidence

Plaintiff alleges disability due to muscle aches and pains, brain lesions, bipolar disorder, depression, uncontrolled "severe" Grand Mal seizures, and substance abuse.  (AR 12, 127.)

Plaintiff was incarcerated from October 5, 2000 through December 24, 2001.[4]   (AR 415–64.)  Correction Corporation of America records indicate that Plaintiff was regularly prescribed and administered Dilantin (or Phenytoin, a Dilantin substitute) and Depakote during his period of incarceration.[5]   (*Id.*)

On October 12, 2000, Plaintiff had his first seizure after entering prison.  (AR 430.)  On November 6, 2000, Plaintiff reported having "a small seizure."  (AR 434.)  On December 18, 2000, Plaintiff reported having had four seizures in the previous month.  (*Id.*)  On December 29, 2000, prison staff noted that Plaintiff was "unable to respond to verbal stimuli" and was "observed seizuring continuously."  (AR 434.)  Accordingly, Plaintiff was transported to the hospital via ambulance.[6]   (AR 406, 444.)  Plaintiff's drug

_____

[3] Plaintiff's request for review was received by the SSA on December 13, 2004. (AR 12.)

[4] Plaintiff reported in his SSI application, however, that he was incarcerated from August 13, 2000 until December 27, 2001.  (AR 885.)  Plaintiff was incarcerated for a probation violation following an armed robbery conviction.  (AR 42.)

[5] Plaintiff received additional medications at various times during this period as well; however, Plaintiff's receipt of Dilantin and Depakote are most relevant to the case at bar.

[6] Most of this record is illegible, including the physician's signature. (AR 406.)  The name of the hospital is not included on this record, but it is included in the span of pages identified in the List of Exhibits as "Medical Records . . . from Metropolitan Nashville General Hospital."  (AR 4, 406.)

screenings were negative and his Dilantin level was within the normal range, at 12.6. (AR 408.) The attending physician noted, however, that Plaintiff's Depakote level was "subtheraputic." (AR 406.)

On January 12, 2001, Dr. Nona Logan noted that Plaintiff's Dilantin was within "therapeutic levels," and she recommended that Plaintiff be referred to a neurological clinic for further evaluation. (AR 414.)

On February 13, 2001, Plaintiff's Dilantin level in prison was noted to be low, at less than 2.5. (AR 427.) On February 15, 2001, Plaintiff was "dancing around" and "gesturing wildly" at the door of his cell, "making faces [at the] staff," and being "verbally inappropriate." (AR 424.) He "tried to get out of [his] cell" and was "very combative." (Id.) Later that day, Plaintiff appeared "disoriented," was "unable to verbalize person, place, circumstance," had "difficulty answering questions," and was "mentally lethargic." (AR 425.) The following day, on February 16, 2001, prison staff noted that Plaintiff had taken off all of his clothes and put them in the sink, was "jumping off the bunk on to the floor," and was "continuously screaming and banging" on the door of his cell. (AR 423.) Prison staff administered Plaintiff a Haldol injection, after which Plaintiff's "behavior improved" and he began "talking." (Id.) A few hours later, prison staff observed Plaintiff "sitting up on [the] side of [his] bunk and staring blankly at staff." (Id.) Prison staff noted that Plaintiff was "calm and compliant [with] meds. as ordered." (Id.) Later that morning, prison staff observed that Plaintiff had a "flat affect" and "disheveled appearance," was "smiling inappropriately" at the staff, "stepped back as if to charge as staff prepared to open cell door," "put hands between door and door facing when staff attempted to close the door," and had an "altered psyche." (AR 422.) Plaintiff "nodded" when asked if he would receive another Haldol injection, but "shook [his] head no" when prison staff entered his cell. (Id.) Prison staff noted that Plaintiff's Dilantin and Depakote levels had been variable from "toxic [to] low normal range." (AR 422.) Plaintiff was taken from prison and admitted to Metropolitan Nashville General Hospital for seizures. (AR 395.) Plaintiff's Dilantin level was low, at 4.1, and his Depakote level was likewise low, at "<10." (AR 395, 403.) Plaintiff was administered Dilantin to raise his "subtherapeutic levels." (AR 395.) Plaintiff's brain CT scan showed "old right frontal infarct" and "no evidence of acute intracranial pathology" (AR 397), and his chest examination returned normal results (AR 399). Urinalysis results from February 17, 2001 indicated that Plaintiff's "ketone," "WBC," "gran cast" and mucus levels were abnormal. (AR 400.) Other tests performed returned normal results. (AR 402–

03.)  Plaintiff was discharged from the hospital on February 17, 2001 "improved" and having "no further seizures." (AR 395.)  On February 18, 2001, however, Plaintiff was again combative. (AR 421.)

On March 1, 2001, Dr. Kenneth Gaines saw Plaintiff at Meharry Neurology Clinic for a neurological evaluation of his seizures. (AR 410–13.)  Dr. Gaines noted that Plaintiff had experienced "more than 100" seizures since age thirteen and that "most subsequent seizures have been with cocaine" usage. (AR 410.)  Plaintiff's "recent" Dilantin level was 19.6 and Depakote level was 60. (*Id.*)  Plaintiff's review of systems and physical examination were unremarkable except for a few areas of motor skills.[7] (AR 411–12.)  Dr. Gaines diagnosed Plaintiff with "generalized tonic clonic type" seizures and "frontal encephalomalacia." (AR 412.)

On March 6, 2001, Plaintiff  "became irate, restless," and stated that he "want[ed] to die." (AR 420.)  The following day, Plaintiff claimed not to remember this pronouncement, told prison staff that they could not "keep punishing" him for his brain seizures, and demanded to be let out of his cell. (*Id.*)  Prison staff noted that Plaintiff appeared "easily agitated" with "limited judgment" and "poor impulse control." (*Id.*)

On March 8, 2001, prison staff noted that Plaintiff continued to demonstrate "erratic behavior" that "appear[ed] related to seizure activity." (AR 433.)  On March 22 and March 29, 2001, prison staff noted that Plaintiff continued to exhibit poor impulse control. (AR 419.)

On May 24, 2001, prison staff noted that Plaintiff's condition was "stable." (AR 419.)

On June 24, 2001, prison staff noted that Plaintiff was "disoriented," did not respond to verbal stimuli, had fixed pupils and a "thready" pulse, and had incoherent speech. (AR 432.)  Plaintiff was moved to medical observation and administered medication. (*Id.*)

On June 29, 2001, prison staff observed Plaintiff "lying on the floor" with "visible blood tinged saliva" having a "possible seizure." (AR 431.)

On July 19, 2001, prison staff noted that Plaintiff's condition had become "unstable." (AR 418.)

On August 15 and September 13, 2001, prison staff noted that Plaintiff was "stable" on his medications. (AR 418.)

---

[7] Some areas of motor skills were not marked as "yes," "no," or "not done," but were instead left blank except for the following comments: "/" for "BJ," "2/2" for "TJ," "/" for "BrJ," "2/2" for "KJ," and "/" for "AJ." (AR 411–12.

On October 20, 2001, prison staff noted that Plaintiff was observed in a "postictal phase of seizuring" with "saliva . . . coming out of [his mouth]," while appearing "dazed & confused."  (AR 417.)

On November 8, 2001, Plaintiff did not report any "acute problems" to prison staff.  (AR 416–17.)

On December 2, 2001, prison staff noted that Plaintiff was "on [the] floor, noncoherent [sic]."  (AR 416.)  On December 6, 2001, Plaintiff's condition was reported as "stable."  (*Id.*)

On December 23, 2001, prison staff reported that Plaintiff had had four "seizure episodes."  (AR 416.)  The following day, on December 24, 2001, Plaintiff had another seizure.  (*Id.*)

On approximately December 27, 2001, Plaintiff was released from prison.  (AR 855.)

On February 18, 2002, Dr. Amir M. Arain wrote Dr. Hubert S. Gaskin, III a letter regarding Plaintiff.  (AR 482–84.)  Dr. Arain wrote that Plaintiff had been having seizures since he was thirteen years old, and that Plaintiff believed that his seizures were brought on by drug abuse.  (AR 482.)  Dr. Arain reported that Plaintiff's seizures had been getting worse over the years, and that Plaintiff noted that he experienced three different types of seizures.  (*Id.*)  Dr. Arain reported that Plaintiff "was supposed to take Tegretol" but was not doing so.  (AR 483.)  Dr. Arain referred to an EEG that returned normal results and an MRI that "reportedly showed [a] right frontal lesion."  (*Id.*)  Dr. Arain recommended that Dr. Gaskin check Plaintiff's blood level of Dilantin.  (AR 484.)  Dr. Arain wanted to prescribe Lamictal but noted that Plaintiff was "resistant to make any changes" and did not believe that other seizure medicines would help.  (*Id.*)

On March 5, 2002, DDS examiner Dr. Albert J. Gomez evaluated Plaintiff.  (AR 469–71.)  Plaintiff reported that he would have a seizure "approximately once a week" but would "resume[ ] his activity" following the seizure.  (AR 469.)  Plaintiff reported that he used cocaine approximately two times per week between the ages of seventeen and twenty-one.  (*Id.*)  Plaintiff's physical examination was unremarkable.  (AR 470–71.)  Dr. Gomez opined that Plaintiff could occasionally lift twenty to thirty pounds and could stand or sit at least six hours in an eight hour work day.  (AR 471.)

On March 7, 2002, DDS examiner Dr. William O'Brien, Psy.D., conducted a psychiatric evaluation of Plaintiff.  (AR 472–76.)  Dr. O'Brien noted that Plaintiff showed "no significant evidence of malingering, exaggeration, inconsistency, or lack of effort."  (AR 472.)  Dr. O'Brien found that Plaintiff was "alert and oriented," had "organized and goal directed" thought processes, and had no "current suicidal or homicidal

ideation, plan, or intent." (AR 472, 474.) Plaintiff reported that his typical day consisted of "seeking and using crack cocaine." (AR 474.) Plaintiff further reported that, although he could do "routine household activities," such activities would often be interrupted by "seizure activity or being under the influence of crack cocaine." (*Id.*) Dr. O'Brien diagnosed Plaintiff with "cognitive disorder NOS," bipolar disorder, cocaine dependency, and abuse of marijuana. (AR 475.) Dr. O'Brien believed that the combination of Plaintiff's seizures, bipolar disorder, and crack cocaine addiction "caused marked disruption" in Plaintiff's abilities to sustain concentration and persistence, adapt to moderate and complex work environment changes, effectively work with others, manage his funds, have awareness of "normal hazards" at work and home, and "meet daily tasks of living on a consistent basis." (AR 475.) Dr. O'Brien noted that Plaintiff had refused his offer to enter him into a substance abuse treatment program, although Plaintiff claimed that he would "obtain[ ] treatment services in the near future." (*Id.*)

On March 8, 2002, Plaintiff went to Vanderbilt University Medical Center with complaints of "chest tightness after having a seizure" that morning.[8] (AR 480.) The treating physician noted that Plaintiff's seizures were "related to substance abuse." (*Id.*) Plaintiff was discharged with a diagnosis of seizures and "RAD." (AR 478.) Plaintiff was told to "use inhaler as instructed" and follow-up at the emergency room "for fever, chills, chest pain, questions, or concerns." *Id.*)

On June 3, 2002, Dr. Gary R. Schwartz saw Plaintiff in the emergency department with complaints of seizures.[9] (AR 614–15.) Plaintiff reported compliance with his medication. (AR 614.) Plaintiff's Dilantin level was 8.0, and his Dilantin was increased. (AR 615.)

On June 17, 2002, DDS physician Dr. "RFC" Kourany completed a Psychiatric Review Technique form regarding Plaintiff. (AR 532–45.) Dr. Kourany noted that Plaintiff had "organic mental disorders," "affective disorders," and "substance abuse disorders." (AR 532.) Plaintiff's first disorder was related to cognitive functioning.[10] (AR 533.) Dr. Kournay identified Plaintiff's affective disorder as bipolar disorder. (AR 535.) Dr. Kourany stated that both of these disorders were related to Plaintiff's substance abuse, which, according to Plaintiff, was in "remission." (AR 540.) Dr. Kourany believed that Plaintiff's disorders

---

[8] Some of the records from this hospital visit are illegible. (AR 478–81.)

[9] Although not identified on this record, Dr. Schwartz's note falls within the span of pages given in the List of Exhibits as "Medical Records . . . from Vanderbilt University Medical Center." (AR 614–15.)

[10] The "medically determinable impairment" is partially illegible. (AR 533.)

caused him mild limitations in performing his activities of daily living, and moderate limitations in "maintaining social functioning" and "maintaining concentration, persistence, or pace"; he noted no "repeated episodes of decompensation."  (AR 542.)

Also on June 17, 2002, Dr. Kourany completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff.  (AR 529–31.)  Dr. Kourany opined that Plaintiff was moderately limited in his abilities to "maintain attention and concentration for extended periods," "perform activities within a schedule," "maintain regular attendance," "be punctual within customary tolerances," "complete a normal workday and workweek without interruptions from psychologically based symptoms," "perform at a consistent pace," "interact appropriately with the general public," "accept instructions and respond appropriately to criticism from supervisors," and "set realistic goals or make plans independently of others."  (AR 529–30.)  Dr. Kourany opined that Plaintiff had marked limitations in his abilities to "understand and remember detailed instructions" and to "carry out detailed instructions."  (AR 529.)  Dr. Kourany believed that Plaintiff was not significantly limited in all other areas.  (AR 529–30.)  Dr. Kourany remarked that his findings would no longer be applicable if Plaintiff's claims that he was no longer using drugs were true, because those findings took into account narcotics abuse issues.  (AR 531.)

On June 18, 2002, Dr. Corey M. Slovis saw Plaintiff in the emergency department for complaints of increasing frequency of his seizures and a desire for seizure medications.  (AR 609–10.)  Plaintiff reported that he was "unsure" how often he took his seizure medicine and was "unsure" of the last time he took either his Keppra or Dilantin.  (AR 610.)  Plaintiff reported to Dr. Richard T. Hoos that "he occasionally misses his medication but tends to take them regularly."  (AR 611–12.)  His Dilantin level, however, was 4.3.  (AR 612.)  Dr. Slovis noted that Plaintiff "left prior to receiving his medications [and] a complete history and physical, [and prior to] being signed out."  (AR 610.)  Dr. Slovis further noted that Plaintiff had "failed three inpatient cocaine detoxifications."  (AR 611.)

On August 5, 2002, DDS physician Dr. Reeta Misra completed a Physical Residual Functional Capacity Assessment form regarding Plaintiff.  (AR 546–53.)  Dr. Misra found that Plaintiff had no exertional, postural, manipulative, visual, or communicative limitations.  (AR 547–50.)  Dr. Misra's only noted environmental limitation was for Plaintiff to "avoid all exposure" to hazards such as machinery and

heights. (AR 550.) Dr. Misra's primary diagnosis was seizures, adding that "noncompliance has been noted in the past." (AR 546, 553.)

On August 20, 2002, Plaintiff was taken to Centennial Medical Center with complaints of chest pain. (AR 570–71.) Plaintiff had experienced a seizure after smoking marijuana and reported that he was "just forgetting" to take his seizure medication. (AR 570.) A drug screen was positive for cocaine in addition to marijuana. (*Id*.) Dr. Mark T. Byram treated Plaintiff, diagnosing him with "acute chest pain" and substance abuse. (AR 571.)

On September 7, 2002, Plaintiff was admitted to Centennial Medical Center, under Dr. Byram's care, after a "possible seizure." (AR 564–65.) Plaintiff's family reported that Plaintiff had "been missing from home for several days." (*Id*.) Dr. Byram did not consider Plaintiff "to be a reliable source of information." (*Id*.) Laboratory data showed Plaintiff's Dilantin level to be 6.2, and Plaintiff was diagnosed with seizures and "polysubstance abuse." (*Id*.) Dr. Byram noted that Plaintiff had been noncompliant in taking his medication. (*Id*.)

On September 22, 2002, Plaintiff was admitted to Centennial Medical Center, complaining that the left side of his body hurt.[11] (AR 561–62.) Dr. Kayur Patel noted that Plaintiff had also been to the hospital the previous day with seizures and that, at that time, he had been noncompliant with his medications. (AR 561.) Plaintiff told Dr. Patel that he was then compliant. (*Id*.) A CT scan showed "evidence of no acute bleed" in Plaintiff's head. (AR 562.) Dr. Patel "reiterated the issue with medication compliance" to Plaintiff. (*Id*.)

On July 5, 2003, Plaintiff was admitted to Vanderbilt University Medical Center because of seizures. (AR 665, 668.) Plaintiff reported that his "usual" seizure rate was once per week, but that he had "had approximately 10 seizures" since the previous day. (AR 668.) Dr. Sally A. Santen noted that Plaintiff's seizures had come with increasing frequency since he had stopped taking his medication four days prior. (AR 668–69.) Plaintiff admitted to "recent cocaine use," but his drug screen did not reveal any cocaine or Benzodiazepine. (AR 669.) Dr. Santen attributed the seizures in part to withdrawal from Benzodiazepine. (*Id*.) On July 6, 2003, Dr. Kelly Ybema noted that Plaintiff reported that he had not used

---

[11] The record lists the admission date as September 23, 2002, but the record itself is dated a day earlier. (AR 561.)

cocaine in twenty-one days, and she likewise attributed the increased frequency of Plaintiff's seizures to "abrupt benzodiazepine withdrawal." (AR 667–68.) Plaintiff's Dilantin was increased during his hospital stay, and he "remained stable" and "seizure free" during that period. (AR 665.) Plaintiff was discharged on July 7, 2003 with prescriptions for Keppra, Dilantin, Zonegran, and Klonopin. (AR 665–66.)

On July 16, 2003, Plaintiff was admitted to the University Medical Center for seizures he had experienced the day prior. (AR 679–80.) Plaintiff reported that he had been compliant with taking his Dilantin and Keppra. (AR 679.) Plaintiff reported to Registered Nurse N. Taylor that he saw "spots" and "lines" following those seizures. (AR 680.) Plaintiff's physical examination returned normal results.[12] (AR 681.) Plaintiff's Dilantin level was low, at 6.6. (AR 682, 686.) Dr. John L. Butcher diagnosed Plaintiff with seizure disorder and discharged him after a few hours, with an increased prescription for Dilantin.[13] (AR 679, 685.)

On September 25, 2003, Dr. Arain saw Plaintiff for a follow-up examination. (AR 579–82.) Dr. Arain noted that Plaintiff had "been noncompliant with his follow up visits" and "continue[d] to do cocaine intermittently." (AR 579.) Dr. Arain diagnosed Plaintiff with "partial epilepsy independent right front and left temporal) poorly controlled on the current regimen, partly because of perhaps efficacy [of the medications, presumably] and partly because of his drug abuse." (AR 582.) Dr. Arain advised Plaintiff not to work in unprotected elevated places or with heavy moving machinery. (*Id.*)

On November 20, 2003, Dr. Arain saw Plaintiff for a follow-up to his September visit. (AR 574–77.) Dr. Arain repeated the same assessment, again noting that Plaintiff's epilepsy was "poorly controlled on the current regimen." (AR 577.)

On May 11, 2004, Dr. William E. Lummus examined Plaintiff at Vanderbilt University Medical Center. (AR 655–56.) Plaintiff reported that he had had two recent seizures despite reported compliance with his medications. (*Id.*) Plaintiff's Dilantin level was 7. (AR 655.) Dr. John J. Block's impressions from Plaintiff's CT scan were "right frontal lobe encephalomalacia unchanged from February 29, 2004," "no acute intracranial pathology identified" and "minimal left maxillary sinus disease." (AR 657.)

---

[12] The nurse's signature is illegible. (AR 681.)

[13] The nurse's signature is illegible. (AR 679.)

On July 15, 2004, Dr. Arain completed an Epilepsy Questionnaire regarding Plaintiff on which he noted that his assessment would be based upon Plaintiff's condition as it existed when Plaintiff was not using drugs. (AR 822–23.) Dr. Arain noted that Plaintiff suffered from "§ 11.02 Epilepsy-major motor seizures," both daytime and nighttime, "occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment." (AR 822.) Dr. Arain added that Plaintiff's epilepsy was "poorly controlled" because of "poor compliance" and "multiple epileptic foci." (AR 823.)

## B. Plaintiff's Testimony

Plaintiff was born on March 26, 1978 and has a general equivalency diploma. (AR 41, 854.) Plaintiff began college at the age of seventeen but did not complete it. (AR 41.) Plaintiff added that he had received some vocational training to be a mortician "but never finished." (*Id.*)

Plaintiff testified that he had been incarcerated for a probation violation on his "strong-arm robbery" conviction. (AR 42.) Plaintiff reported that he had not tried to work anywhere since December, 2001. (AR 41.) Plaintiff added that he had applied to places since his release from prison but had not been hired anywhere. (AR 42.) Plaintiff stated that he had worked at Shoney's "probably a week or two at the most," but his seizures made it so that he "just couldn't maintain." (AR 46–47.) Plaintiff testified that his seizures had ended his motel clerk job as well, after "about two weeks." (AR 47.) Plaintiff stated that he did not know how some additional jobs – LaQuinta Inn, McDonald's, and Kenny Roger's Roaster – ended up on his earnings record, adding that, if he had worked at those places, he could not remember them because "it had to have been a long time ago, and . . . seizures totally make your memory go away." (AR 47–48.)

Plaintiff testified that he believed that he was disabled from working because of his seizures. (AR 43.) Plaintiff testified that he could not walk during a seizure and would become "very sore [and] lethargic." (*Id.*) Plaintiff testified that he did not have a driver's license because he "couldn't get a license because of [his] epilepsy." (AR 41.) Plaintiff noted that he experienced three different types of seizures – "grand mal," "petit mal," and "postictal" – but clarified that although he experienced all three, he had come to a point where most of his seizures were grand mal. (AR 45–46.) Plaintiff reported that he would say inappropriate things while postictal without remembering that he had done so. (AR 48.) Plaintiff stated

that he was not a candidate for surgery "because of where [his] polycystic conceptual malacia is at," and that he would have seizures for the rest of his life.  (AR 56.)

Plaintiff reported that his seizures caused him to be depressed "a lot."  (AR 55.)  Plaintiff stated that he would sometimes "stay up for a few days" as a result of "adrenaline from mania."  (*Id.*)  Plaintiff testified that his mood swings also prevented him from holding jobs because they prevented him from "maintain[ing] communication" and caused him to get "real reclusive."  (AR 55–56.)  Plaintiff stated that, when he got depressed, he would do almost nothing except cry and write alone.  (AR 56.)

Plaintiff stated that crack cocaine and marijuana were his "drug[s] of choice."  (AR 42.)  Plaintiff reported having used crack cocaine "if not everyday, every other day" in the past but testified that recently he had not "been using it."  (*Id.*)  Plaintiff reported that he had used marijuana just as often and that he had been doing so since his release from prison.  (AR 42–43.)  Plaintiff stated that he could afford drugs by panhandling, asking for money, or sharing with friends.  (AR 43.)

Plaintiff admitted that his crack cocaine usage made his seizures worse with regard to frequency and duration, but noted that he would "still have very frequent seizures" when he was "clean."  (AR 44.)  Plaintiff added that he had been unable to "last 30 days" without a seizure and that he would sometimes "have multiple seizures."  (*Id.*)  Plaintiff stated that he was unsure whether his marijuana usage also caused his seizures, and that "doctors . . . tell [him] different things about that."  (*Id.*)  Plaintiff noted that some of his doctors had told him that marijuana usage helped with his seizures.  (*Id.*)

Plaintiff testified that there had been multiple times in his past where he had not taken his seizure medications, but he "very seldom" did not take them because he was "very scared" of his seizures.  (AR 44.)  Plaintiff testified that he had been taking his medication as prescribed prior to the hearing.  (AR 54.)  Plaintiff stated that he took his medication as prescribed in prison, stating that he had had to take it in front of the staff medication dispensers.  (AR 45.)  Plaintiff reported that he believed he would receive improperly high or low dosages of his medication from the prison staff.  (AR 49.)  Plaintiff reported that he had had seizures "quite a bit" while in prison, "at least on[e] a week."  (AR 45.)  Plaintiff stated that most "if not all" of his seizures while incarcerated were grand mal seizures.  (AR 46.)  Plaintiff further reported that he did not have cocaine or marijuana available to him in prison, adding that he never failed a drug screen while incarcerated.  (AR 49.)  Plaintiff testified that the doctors told him while he was in prison that his low

Dilantin levels could be attributable to seizures "burn[ing] up a lot of the medication" rather than to noncompliance. (AR 53–54.)

Plaintiff stated that he had participated in a drug abuse program for six weeks earlier in the year, during which he "stay[ed] clean." (AR 50.) Plaintiff testified that he had continued to have seizures during that period. (*Id.*) Plaintiff reported that he had used cocaine "a few times" since that program. (*Id.*) Plaintiff testified that, despite his continued drug use, he attended "NA and CA, and AA" because he "really want[ed] to stop," adding that "everyone . . . has relapsed" in those programs. (AR 51.) Plaintiff stated that those sessions had helped him in attempting to quit. (AR 52.) Plaintiff stated that, as of the date of the hearing, he had "been clean for almost a month," and that "the longest period [he had] been clean was 70 days" in 2002. (AR 51.) Plaintiff testified that he had "had several, several seizures" during that seventy-day period. (AR 52.) Plaintiff stated that, during his clean period just prior to the hearing, he had experienced four grand mal seizures. (*Id.*)

Plaintiff stated that he lived with his mother, brother, sister, and mother's boyfriend. (AR 41.) Plaintiff testified that his mother knew how to take care of him if he experienced a seizure. (AR 54.) Plaintiff reported that doctors were considering trying "therapy" on him, but he did not identify what type of therapy. (AR 56.)

### C. Witness Testimony

Plaintiff's mother, Elizabeth DiMeola, also testified at Plaintiff's hearing. (AR 34–35.) Ms. DiMeola testified that Plaintiff lived with her and did not use cocaine and marijuana around her. Ms. DiMeola described various stages of Plaintiff's seizures as "full jerking," "salivating at the mouth," "turning blue," "flopping," and "falling," followed by "letharg[y] and sore[ness], pain," and "confus[ion]." (AR 58.) Ms. DiMeola testified that Plaintiff's seizure diary was an accurate portrayal of the frequency of his seizures, and she verified Plaintiff's testimony that he was "good" about taking his seizure medications. (*Id.*)

Ms. DiMeola stated that the only jobs she knew Plaintiff ever held were at Shoney's, "a place where they sold meat off a truck," a place "like Checkers," and "a restaurant downtown" named "Pazza." (AR 59.) Ms. DiMeola added that she had no idea how other jobs ended up on Plaintiff's earnings record, except that maybe at LaQuinta Inn, some female acquaintances who were applying had "used his Social

Security number." (*Id.*) Ms. DiMeola stated that Plaintiff consistently got fired because "he just kept having seizures." (*Id.*)

Ms. DiMeola testified that Plaintiff suffered from bipolar disorder, would get angry, had mood swings and was "a very depressed person." (AR 60.) She noted that Plaintiff would get "frustrated because of his epilepsy" and was "always afraid he's going to die." (*Id.*) Ms. DiMeola added that she would often see Plaintiff "crying," "mad," "frustrated," and "confused" because he "want[ed] a future." (*Id.*)

### D. Vocational Testimony

Vocational Expert ("VE") Dr. Gordon Doss also testified at Plaintiff's hearing. (AR 34–35.) The VE testified that Plaintiff had worked "only two jobs . . . for very brief periods of time" in his past. (AR 40.) One position was as a server at Shoney's, which would be classified as light and unskilled, and the other position was as a counter clerk at a Stadium Inn motel, which would be classified as light and semi-skilled. (*Id.*) The VE added that the motel job included some transferable communication skills "that would transfer to sedentary jobs that involve relating to people such as receptionist." (*Id.*)

The ALJ presented the VE with a hypothetical claimant of Plaintiff's age, education and work experience, and asked the ALJ to "assume jobs not involving hazards or driving. Assume the person's not able to maintain attention and concentration for extended periods." (AR 60.) The ALJ asked what jobs would be available to a person with those limitations in the Tennessee regional economy, and which jobs would allow the greatest absenteeism from work. The VE answered that the hypothetical claimant could work at the unskilled entry level at both light and sedentary jobs and that, in the State of Tennessee, there were approximately 5,726 general office clerk jobs at the sedentary unskilled level and 5,960 at the light unskilled level; 2,393 file clerk jobs at the light unskilled level; and 3,898 domestic housekeeper jobs at the light unskilled level, all of which would be appropriate for the hypothetical claimant. The VE further testified that the ability to perform those jobs would not be affected by an additional limitation of only being able to follow instructions and make judgments that are "short and simple." (AR 61.) The VE added that "interacting with the general public" would not be required in any of those jobs. (AR 62.) The VE testified that, at those jobs, the nationwide average of allowable absenteeism was "about three days a month." (*Id.*) The VE further confirmed that the availability of these

jobs would not be affected if the person was only able to understand, remember and carry out short and simple instructions, and to make judgments only on simple work-related decisions.  (AR 61.)

The ALJ also asked the VE what the impact would be on the jobs identified if the ALJ found the Plaintiff's testimony to be fully credible.  The VE responded that if the Plaintiff were having seizures of the type and frequency alleged, despite consistent treatment, that it would be "very difficult to work on a full-time basis."  (AR 62.)

The ALJ presented the VE with a hypothetical claimant mirroring the assessment of Dr. O'Brien (AR 472–76), highlighted by Dr. O'Brien's belief that Plaintiff had "marked disruption[s]" in many areas, and asked if the hypothetical claimant would be able to perform full-time work. (AR 62-63.)  The VE answered in the negative.  (AR 63.)

The VE testified that he determined the jobs and number of jobs available through U.S. Department of Labor documents available from U.S. Publishing such as the Employment Quarterly, as well as the internet, the newspaper, and the Tennessee Department of Employment Security, qualifying these figures with knowledge from his personal experience.  (AR 64–65, 73.)  The VE further testified that, as a result, not all of the numbers he testified to came directly from a publication.  (AR 64.)  The VE added that the numbers of jobs available to which he testified were current.  (AR 65.)

In responding to Plaintiff's cross-examination, the VE testified that he could probably find more available jobs for a hypothetical claimant who had grand mal seizures thirteen times per year than he could find for the hypothetical claimant mentioned by the ALJ.  (AR 70–71.)

III.    CONCLUSIONS OF LAW

A.    Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Sec'y, Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Sec'y, Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999)

(citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 245 (6th Cir. 1996) (citing *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Sec'y, Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980) (citing *Futernick v. Richardson*, 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

**B.    Proceedings At The Administrative Level**

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[14] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.

(5)  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th

Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid cannot be used to direct a conclusion but only as a guide to the disability determination.  *Id.*  In cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case of disability by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Sec'y, Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

## C.    Plaintiff's Statement Of Errors

Plaintiff's primary contention is that the ALJ erred in disregarding the medical evidence from Plaintiff's period of incarceration to find that Plaintiff's seizure disorder did not meet Listing 11.02 A or B.

_____

[14] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

Plaintiff also contends that the ALJ improperly determined that Plaintiff's drug abuse was a contributing factor material to a finding of disability, because Plaintiff demonstrated that he had a period longer than twelve months of "unquestionable medical compliance" during which he continued to have seizures. (Doc. No. 24, at 38.)  Plaintiff further argues that the ALJ erred in (1) relying upon the VE's testimony of available jobs that Plaintiff could perform because the VE's answers admittedly included semi-skilled jobs; (2) failing to "make specific findings based on the medical evidence regarding the extent to which these seizures might occur in the absence of drug use"; (3) failing to establish that there was a significant number of jobs that Plaintiff could perform; (4) presenting "defective" hypothetical questions to the VE and relying upon the VE's answers to those "defective" hypotheticals; (5) "cherry picking" evidence to support a denial and failing to examine the evidence of record as a whole; (6) failing to determine medical equivalence under the Listings; and (7) failing to accord appropriate weight to the opinion of Dr. Arain, Plaintiff's treating physician.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed or, in the alternative, remanded.

Sentence four of § 405(g) states as follows:

The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Sec'y, Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

Plaintiff in the case at bar argues that he is disabled because his seizure disorder meets Listing 11.02 A and B.  Although Plaintiff admittedly used illegal drugs and acknowledged that his drug usage exacerbated the frequency and intensity of his seizures, Plaintiff argues that his drug usage was not a material factor that contributed to his inability to work.  Plaintiff argues that records from his incarceration

demonstrate that his seizure disorder meets the Listing because he could not obtain illegal drugs during his incarceration and was compliant with his medication as administered to him during that period (which exceeded the requisite twelve months), but nevertheless continued to suffer from seizures. Plaintiff contends that the ALJ improperly rejected the evidence from Plaintiff's incarceration with the "demonstrably false assertion" that SSA does not allow the consideration of such evidence.

Listing 11.02 states as follows:

Epilepsy – convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment. With:

A. Daytime episodes (loss of consciousness and convulsive seizures) or

B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02 (italics removed).

In analyzing whether Plaintiff was disabled, the ALJ observed:

[Plaintiff] has lived a reckless and chaotic lifestyle that has been harmful to him and others, marked by multiple traumatic head injuries from beatings and accidents, incarcerations, noncompliance with prescribed seizure medications and sustained illicit drug abuse (primarily crack cocaine and marijuana). Further, he readily admitted during his hearing that seizure frequency and intensity increases with his drug abuse, which, by all credible indications, is ongoing.

(AR 18–19.)

Because Plaintiff admittedly abused illegal drugs, the Regulations require the ALJ to determine whether Plaintiff's drug abuse was material to his inability to work. 20 C.F.R. § 404.1535. In other words, the ALJ must determine whether Plaintiff's seizure disorder would preclude him from maintaining substantial gainful employment if he refrained from using illegal drugs and was compliant with taking his prescribed seizure medication.

The ALJ acknowledged that Plaintiff was "obviously unable to work while taking part in his ongoing crack addiction" and ultimately found that Plaintiff's drug abuse was "a material factor contributing to his inability to work." (AR 19.) In making this finding, the ALJ was bound to determine whether medicinal compliance would control Plaintiff's seizures to the extent that he would be able to work, despite other limitations. As the ALJ noted, the record generally demonstrates, and Plaintiff has acknowledged, other than the period during which he was incarcerated, Plaintiff has been less than fully

compliant with taking his seizure medication. (AR 20.) Plaintiff has repeatedly acknowledged that he did not always take his seizure medication while he was abusing drugs, and that, other than his incarceration, the longest period during which he abstained from using drugs was approximately seventy days in 2002 (during which time he reportedly continued to have seizures). (AR 51–52.)

Plaintiff was incarcerated from October 5, 2000 through December 24, 2001, a period of approximately fourteen months. The ALJ, in his decision, accepted that Plaintiff had abstained from using illegal drugs while incarcerated. (AR 20.) The ALJ opined, however, that:

> It is [Plaintiff's] noncompliance with medical treatment and advice, both as to taking prescribed medications and not taking illicit street drugs, that is "unquestionable" within the context of the record as a whole. It is the clear policy of the Social Security Administration that a claimant cannot receive entitlement to the help of society through Social Security disability benefits if he will not help himself by medicinal compliance.
>
> Even if the evidence during incarceration for a felony would otherwise support a finding of disability, it would not be consistent with Social Security Administration policy to consider it. It is true that the seizure disorder is longstanding, and that there is no evidence that any injury during either the commission of the particular felony for which the claimant was imprisoned or occurring during the imprisonment either precipitated or aggravated the impairment. However the fact remains that the evidence upon which the claimant proposes to rely to support his disability claim directly arose from the commission of a felony which, in this case, involved an armed robbery of some nature. The obvious purpose of the preclusion against finding disability based on an injury or worsening of an injury arising from commission of a felony or incarceration therefore, codified at 20 CFR 404.1506, is to establish an agency policy that an individual may not benefit through the receipt of Social Security disability benefits as the result of committing a felonious crime. I will not defy that clear policy by implementing the theory advanced by [Plaintiff's] attorney.
>
> Further, as previously noted, prisoners are not entitled to benefits during the time that they are incarcerated. 20 CFR 404.468 and 416.1325. It would make no logical sense whatsoever to award benefits on the basis of evidence generated during a period of time (i.e., imprisonment) when [Plaintiff] could not have even been entitled to draw benefits under the law, with said evidence not replicated either before or since the incarceration. This is even more the case when it is beyond credible argument that [Plaintiff] resumed his DA/A and medicinal noncompliance lifestyle upon release.
>
> Based upon the foregoing, the evidence of seizure activity or lack thereof, medicinal compliance or lack thereof, and DA/A abstinence or lack thereof during [Plaintiff's] felony incarceration is immaterial to this decision.

(AR 20–21.)

As an initial matter, the focus of the ALJ on Social Security policy rationales is misplaced, and the conclusions drawn by the ALJ as to the purported purposes of Social Security Regulations are unsupported extrapolations that do not bind this Court. The Regulations referenced by the ALJ (20 CFR §§ 404.1506, 404.468, and 416.1325) and used as bases for his extrapolations are inapposite to the case

at bar. 20 CFR § 404.1506 prevents a finding of disability based upon injuries sustained during, or aggravated by, the commission of a felony. Plaintiff does not allege disability on any such basis. As the ALJ acknowledged, "there is no evidence that any injury during either the commission of the particular felony for which [Plaintiff] was imprisoned or occurring during the imprisonment either precipitated or aggravated the impairment." 20 CFR §§ 404.468 and 416.1325 prevent prisoners from receiving disability benefits while incarcerated. Plaintiff is not seeking benefits for the period of his incarceration. Rather, Plaintiff simply seeks consideration of his medical records during his period of incarceration because that is the only period greater than twelve months that he abstained from using drugs and was medicinally compliant. The ALJ's refusal to consider Plaintiff's incarceration records because Plaintiff would benefit by them thwarts justice when those records are the only evidence that can conclusively demonstrate Plaintiff's disability.

Because Plaintiff has not been sober or medically compliant for at least twelve consecutive months at any given time other than during his period of incarceration, the undersigned finds it necessary to consider Plaintiff's incarceration records in order to determine whether, absent drug abuse and with medicinal compliance, Plaintiff would continue to have seizures "more frequently than once per month in spite of at least 3 months of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02. In carefully reviewing the records from Plaintiff's incarceration, the undersigned finds it significant that there is only one noted instance where Plaintiff refused any medication, and that was when Plaintiff was in the midst of experiencing seizure episode activity and refused to receive a second Haldol injection.[15] (AR 440.) Thus, there is absolutely no indication in the record that Plaintiff ever refused his seizure medication while incarcerated.[16]

Despite Plaintiff's apparent compliance with his medication as administered to him, prison records demonstrate that Plaintiff's Dilantin and Depakote levels remained unstable, ranging from

---

[15] Haldol is a psychiatric medication used to treat nervous, mental, and emotional conditions. *See* www.mayoclinic.com; www.webmd.com. It is used, *inter alia*, to reduce aggression, restore clarity of thought, lessen anxiety, decrease hallucinations, and decrease negative or suicidal thoughts. *Id.* Haldol is not an anti-seizure medication.

[16] The clear documentation of Plaintiff's refusal of the second Haldol injection suggests that prison staff would have noted if Plaintiff had refused medication on other occurrences as well. The fact that there are no other reported instances of refusals indicates that Plaintiff was compliant with his medication as administered to him during his incarceration.

"subtherapeutic" to "toxic," and that Plaintiff continued to have seizures on a consistent basis. Both Defendant and the ALJ reference several reports of Plaintiff's "subtherapeutic" levels and "noncompliance" to suggest that Plaintiff's "subtherapeutic" levels were a direct result of his "noncompliance." As has been discussed, however, the record simply does not support that assumption. Rather, the record demonstrates that, despite their efforts, prison staff had difficulty controlling Plaintiff's Dilantin and Depakote levels. Prison staff adjusted Plaintiff's medication dosages as needed in an attempt to bring his levels into the therapeutic range. Prison staff increased Plaintiff's dosages when his labs returned showing "subtherapeutic" levels and ordered his medication withheld when his levels were "toxic." Plaintiff cannot be penalized for prison staff's difficulty in maintaining stability over his levels as he was not responsible for the dosage and frequency of administration of his medication.

Although Plaintiff's seizure disorder was not medically well controlled while he was incarcerated, the Regulations do not so require. As has been discussed, the Regulations simply require the ALJ to determine whether Plaintiff's seizure disorder would preclude him from maintaining substantial gainful employment if he refrained from using illegal drugs and was compliant with taking his seizure medication as prescribed. *See* 20 CFR § 404.1535. It is undisputed that Plaintiff abstained from using illegal drugs while he was incarcerated. The record demonstrates that Plaintiff was compliant with taking his medication as administered to him while incarcerated. The record also demonstrates that, despite Plaintiff's medical compliance and abstinence from illegal drug use, he continued to have seizures more frequently than once a month. Accordingly, Plaintiff's incarceration records demonstrate that his seizure disorder meets Listing 11.02. Plaintiff is, therefore, disabled. Because Plaintiff is disabled, it is unnecessary to address the remainder of Plaintiff's assignments of error.

## IV.    CONCLUSION

For the reasons discussed above, Plaintiff's Motion for Judgment on the Administrative Record will be granted, the decision of the Commissioner reversed, and this cause remanded for further proceedings consistent with this opinion.

An appropriate order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge